WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patrick K. Dingman,<br><br>                Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br><br>                Defendant. | No. CV-14-01684-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the appeal of Plaintiff Patrick Dingman, which challenges the Social Security Administration's decision to deny benefits. (Doc. 17.) For the reasons set forth below, the Court vacates that decision and remands for further consideration.

## BACKGROUND

On February 28, 2011, Dingman filed an application for supplemental security income, alleging a disability onset date of June 1, 2006. (Tr. 143-49.) The disability onset date was later amended to December 1, 2009. (Tr. 28.) After Dingman's claim was denied initially and on reconsideration, he requested a hearing, which the ALJ, Thomas Cheffins, held on October 3, 2012. (Tr. 28-56.) On October 23, 2012, the ALJ issued a decision finding Dingman not disabled. (Tr. 10-21.)

In evaluating whether Dingman was disabled, the ALJ undertook the five-step sequential evaluation for determining disability.[1] (*Id.*) At step one, the ALJ determined

---

[1] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing supplemental security income). Under the test:

that Dingman "did not engage in substantial gainful activity during the period from his alleged onset date of June 1, 2006 [sic] through his date last insured of December 31, 2011." (Tr. 15.) At step two, the ALJ determined that Dingman suffered from the severe impairments of sleep apnea, narcolepsy, cataplexy, hypersomnia, and obesity. (*Id.*) At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the Social Security Administration's listed impairments. (Tr. 16.)

At that point, the ALJ made a determination of Dingman's residual functional capacity ("RFC"),[2] concluding that Dingman could "perform sedentary work as defined in 20 C.F.R. 404.1567(a) except [he] cannot climb ladders, ropes, or scaffolds and can only occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl[,] [and] must avoid concentrated exposure to . . . irritants such as fumes, odors, dust, and gases, moderate use of moving machinery except motor vehicles, and moderate exposure to hazardous conditions." (Tr. 16.) The ALJ thus determined at step four that Dingman could not perform his past relevant work as a ceiling installer. (Tr. 19.) At step five, the ALJ concluded that jobs Dingman could perform despite his limitations exist in

---

> A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations. If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, she is not able to perform any work that she has done in the past. Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy. This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007) (internal citations and quotations omitted).

[2] RFC is the most a claimant can do despite the limitations caused by his impairments. *See* S.S.R. 96-8p (July 2, 1996).

significant number in the national economy. (Tr. 20-21.) Given this analysis, the ALJ concluded that Dingman was not disabled. (Tr. 21.)

The Appeals Council declined to review the decision. (Tr. 1-3.) Dingman filed the complaint underlying this action on July 28, 2014, seeking this Court's review of the ALJ's denial of benefits.[3] (Doc. 1.) The matter is now fully briefed before this Court. (Doc. 17, 25, 26.)

## DISCUSSION

### I.  Standard of Review

A reviewing federal court will only address the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial" evidence amounts to "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

Here, Defendant Commissioner of Social Security concedes that the ALJ's decision "is not supported by substantial evidence," and therefore both parties "agree the ALJ erred and that Plaintiff is entitled to judgment." (Doc. 25 at 2.) The parties disagree only "as to whether the Court should remand for further proceedings or for an award of benefits. (*Id.*) As such, "[t]he sole issue before this Court is remedy." (*Id.*)

### II.  Remedy

Dingman requests that the Court remand his case for an award of benefits. (Doc. 17 at 23.) Remanding for an award of benefits is proper in certain circumstances pursuant to the Ninth Circuit's "credit-as-true rule," under which the Court should

---

[3] Dingman has authority to file this action pursuant to 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . .").

remand for benefits where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

Ninth Circuit precedent "foreclose[s] the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of credit-as-true analysis." *Id.* at 1021; *see also Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the [ALJ] to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."). Therefore, "where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the [improperly discredited evidence] were credited," a reviewing court "will not remand solely to allow the ALJ to make specific findings regarding that [evidence]." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988).

The record is not "fully developed" where there is a lack of evidence on an essential element of the disability analysis, even if the discredited evidence is credited as true. *Id.* at 1399. For example, where a vocational expert is presented with a hypothetical that does not properly reflect the claimant's limitations, and where the claimant's attorney fails "to ask the appropriate hypothetical questions on cross-examination," then there is "*no* evidence in the record as to the jobs available for a person with the claimant's limitations," and a new hearing is necessary to fill the lacuna. *Id.* (citing *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1280 (9th Cir. 1987)). Similarly, where a claimant testified that she could not perform "light" work, but "the record did not include *any* evidence as to whether [the claimant] could perform other (i.e., sedentary) work," the record is not fully developed and "further proceedings [are]

- 4 -

1 necessary." *Id.* (citing *Cotton v. Bowen*, 799 F.2d 1403, 1408 n.5 (9th Cir. 1986)).

2 Here, Dingman's attorney cross-examined the vocational expert and asked:

> If we were to accept the claimant's testimony today which includes falling asleep on an unscheduled basis and being unable to prevent napping during the workday on an average three to four times a day for periods of 20 to 45 minutes at a time, is that consistent with the claimant's past work or any other work?

(Tr. 52.) The vocational expert responded, "No, it would not be." (*Id.*) The record therefore does not lack evidence about the jobs available to Dingman.

Defendant claims that further proceedings are necessary to determine the onset date of Dingman's alleged disability. (Doc. 25 at 4-7.) "In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available." *Titles II & XVI: Onset of Disability*, SSR 83-20 (S.S.A. 1983), *available at* 1983 WL 31249. "Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability. The medical evidence serves as the primary element in the onset determination." *Id.* "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred" because the onset occurred "prior to the date of the first recorded medical examination," especially when the alleged onset date is "far in the past and adequate medical records are not available." *Id.* When an ALJ determines that a claimant is not disabled, he generally will not address or determine the onset date. *See Dominguez v. Colvin*, No. 13-17380, 2015 WL 8600040, at *5 (9th Cir. Dec. 14, 2015). "*When further proceedings are necessary* to determine the onset date, it is appropriate to remand for those proceedings." *Id.* (emphasis added).

Here, Dingman's date of onset was amended at the hearing to be December 1, 2009. (Tr. 28.) The record contains medical reports dating back to as early as December 23, 2009. (Tr. 235.) The date of onset alleged by Dingman is consistent with all the evidence available. Because the onset did not occur significantly before the date of the first recorded medical examination, the date of onset need not be inferred, and the services of a medical advisor are unnecessary. No further proceedings are necessary to

determine the onset date.

Defendant further argues that because time has passed since the ALJ made his decision, further proceedings would allow an ALJ to consider how Dingman's health has fared during the time period that has elapsed since he was denied benefits. This is a meritless argument. Time inevitably passes between a denial of benefits and a review of that denial. If the credit-as-true rule could not be applied merely because time passed, the rule would be entirely useless.

Nonetheless, even though there is no essential part of the disability analysis for which evidence is entirely lacking, the record contains significant conflicting evidence. "[A] significant factual conflict in the record . . . should be resolved through further proceedings on an open record before a proper disability determination can be made." *Brown-Hunter v. Colvin*, 806 F.3d 487, 495-96 (9th Cir. 2015). Courts must "assess whether there are outstanding issues requiring resolution *before* considering whether to hold that the claimant's testimony is credible as a matter of law." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th Cir. 2014); *see also Dominguez*, 2015 WL 8600040, at *3 ("If the district court does determine that the record has been fully developed, *and there are no outstanding issues left to be resolved*, the district court must next consider [the third step of the credit-as-true analysis]." (emphasis added) (citations omitted)). A significant factual conflict is an outstanding issue requiring resolution through further proceedings. *Treichler*, 775 F.3d at 1101 ("Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."). Here, the record contains contradictions that raise "serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1107; *Garrison,* 759 F.3d at 1021.

Dingman testified that he sleeps for a minimum of 3 hours and 45 minutes during each workday, but he also testified that he is solely responsible for the care and supervision of his four-year-old child during the workday. Dingman testified that every day, during the hours of a typical workday, he falls asleep "at least three to four" times,

1 and these sleeping spells last "20 to 45 minutes" on average. (Tr. 39.) In addition to
2 these accidental sleeping spells, he takes a morning nap at about 8:30 in the morning for
3 approximately 45 minutes (Tr. 41) and an afternoon nap which begins at 12:30 or 1:00 in
4 the afternoon and lasts until 3:00 or 3:30. (Tr. 42.) He testified that on a typical day,
5 after his wife leaves for work, he turns on cartoons for his four-year-old and then "dozes
6 off for a few minutes." (Tr. 43.) Then he wakes up and "tr[ies] to walk around" and
7 "maybe pick[s] up . . . something that needs to be picked up or hand wash[es] a couple of
8 dishes." (*Id.*) But by 8:30 or 9:00 A.M., he "can't stand it anymore" and he "go[es] and
9 lay down on the couch and take[s] a nap." (*Id.*) Dingman testified that when he is
10 awake, he reads stories to his son or plays with him on the living room floor. (Tr. 47.)
11 But regardless of the quality of care that Dingman provides when he is awake, Dingman
12 testified to sleeping through a significant percentage of the workday. If Dingman's
13 testimony is true, his four-year-old child lacks supervision during much of the day. Thus,
14 Dingman's testimony is not credible unless one believes that he and his wife neglect the
15 care of their small child during these significant lapses.

16 Furthermore, although Dingman testified that it would be unsafe for him to go on
17 a walk without an adult present because he could fall asleep, he also testified that he still
18 drives. Dingman testified that he will not go for walks alone or with only his son:

> I generally need somebody, an adult, with me if I were to make attempts at 30 minutes because if I were to get tired and fall asleep somewhere, I'd need somebody to be able to go and get a car to come pick me up and . . . I certainly can't be making attempts at that with a four-year-old in tow because if I fell asleep outside the home, I have no idea what would happen to my child.

23 (Tr. 45-46.) However, when the ALJ pointed out that the record suggests that Dingman
24 still shops and drives, Dingman testified that he "will drive up to a mile to the gas
25 station." (Tr. 46.) He further testified that as recently as six to eight months earlier, he
26 had been driving longer distances. (*Id.*)

27 Needless to say, falling asleep while driving is far more dangerous than falling

- 7 -

1 asleep while walking.[4] Dingman testified that if he wants to go anywhere besides the gas
2 station, his wife has to take the day off work to drive him there. (Tr. 46.) Implicit in this
3 testimony is that he drives to the gas station while his wife is not at home, so either he is
4 leaving his four-year-old child at home unattended, or he is taking him along as a
5 passenger on these drives, despite the risks that narcolepsy and cataplexy pose while
6 driving. Dingman testified that when he has an episode of cataplexy, his "eyes roll
7 around" and he "lose[s] control of . . . arm and muscle tone" and sometimes falls. (Tr.
8 37-38.) He testified that the attacks last "between five and probably 30 seconds," that he
9 has two such episodes per day, and that he has no warning before such an attack occurs.
10 (Tr. 38.) Dingman's abundance of caution in not taking walks without an adult present is
11 hard to reconcile with the extreme risk that driving entails for him in light of his alleged
12 cataplexy and narcolepsy.

13 Furthermore, Dingman confirmed while testifying that his treating neurologist, Dr.
14 Anderson, suggested that Dingman could get exercise by parking in a parking spot far
15 away from a door so that he will have to walk further. (Tr. 45.) This suggests that Dr.
16 Anderson had no problem with Dingman driving. Nonetheless, Dr. Anderson checked a
17 box indicating that Dingman should be completely restricted from "driving automotive
18 equipment." (Tr. 306.)

19 There appear to be at least implicit inconsistencies in such evidence. Dingman
20 may be disabled, but "the record also contains cause for serious doubt." *Burrell v.*
21 *Colvin*, 775 F.3d 1133, 1141-42 (9th Cir. 2014) (serious doubt where claimant's
22 "testimony at the hearing regarding her ability to knit appears to contradict the medical
23 record"). "In light of the conflicts and ambiguities in the record," the Court concludes

---

[4] On a questionnaire, Dingman indicated that he had a "high chance" (a 3 on a scale of 0-3) of falling asleep while sitting and reading, watching TV, lying down to rest, or sitting quietly after a meal. (Tr. 260.) He indicated that he had a "moderate chance" (a 2 on the scale) of falling asleep while sitting inactive in a public place, being a passenger in a car for an extended time, or sitting and talking with someone. (*Id.*) But he indicated that he would "never" fall asleep "while driving in a car stopped for a few minutes in traffic" (a 0 on the scale). (*Id.*) However, at the hearing, Dingman testified that even if he is engaging in an activity that requires his mind, he cannot ward off a narcoleptic episode "for very long." (Tr. 44.)

- 8 -

"that not all essential factual issues have been resolved." *Treichler*, 775 F.3d at 1105. "Rather, the record raises crucial questions as to the extent of [Plaintiff's] impairment." *Id.* "Where, as in this case, an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency." *Id.*

The Court therefore remands for further proceedings to resolve the outstanding issues that remain as a result of significant conflicting evidence in the record.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **VACATED** and this action is **REMANDED** for further proceedings.

Dated this 22nd day of December, 2015.

_____
Honorable G. Murray Snow
United States District Judge